# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 17, 2014

## STATE OF TENNESSEE v. LADARRON S. GAINES

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1557     Cheryl A. Blackburn, Judge**

**No. M2013-02272-CCA-R3-CD - Filed August 22, 2014**

A Davidson County Criminal Court Jury convicted the appellant, Ladarron S. Gaines, of evading arrest while operating a motor vehicle in which the flight or attempt to elude created a risk of death or injury to innocent bystanders or other third parties, a Class D felony. After a sentencing hearing, the trial court sentenced him as a Range II, multiple offender to eight years in confinement. On appeal, the appellant contends that the evidence is insufficient to support the conviction, that the trial court erred by denying his motion to exclude testimony regarding a surveillance video, and that his sentence is excessive. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROGER A. PAGE JJ., joined.

Jeffrey A. DeVasher (on appeal), Sarah King (at trial), and Kristin Neff (at trial), Nashville, Tennessee, for the appellant, Ladarron S. Gaines.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

At the appellant's May 2013 trial, Officer Will Amundson of the Metropolitan Nashville Police Department (MNPD) testified that about 6:00 p.m. on February 1, 2012, he and his partner were in their marked patrol car in a parking lot at the intersection of Douglas

and Lischey Avenues and conducting "some traffic enforcement." Officer Amundson described the intersection as a "four-way stop." He said that it was "just getting dark outside" but that the intersection was well-lit by street lights and lights from buildings. As the officers were watching the intersection, they observed a 2000 white Ford Taurus travel through the intersection without coming to a complete stop. Officer Amundson saw the driver and said the driver was a large, bald, African-American male.

Officer Amundson testified that he pulled onto Douglas Avenue and sped up to catch the Taurus. After about five seconds, he turned on his patrol car's lights and siren to initiate a traffic stop. Instead of stopping, the driver of the Taurus sped up to about seventy miles per hour. Officer Amundson stated that Douglas Avenue was a two-lane road in East Nashville, that the area was commercial and residential, and that the speed limit was forty to forty-five miles per hour. Officer Amundson said that the Taurus approached an alley and that the driver slowed down "just enough to cut a hard turn on the alley and not bottom out." The driver then "floored it down the alley" and "got up to about fifty." Officer Amundson followed the Taurus into the alley. When the Taurus got to the end of the alley, the driver did not stop and "just kind of flew back into the roadway." Officer Amundson stated that 6:00 p.m. was "rush hour traffic" and that "traffic was having to stop and cars were having to kind of work around [the Taurus] to not get in accidents and not get hit by [it]."

Officer Amundson testified that he and his partner decided to stop pursuing the Taurus due to the risk to the public. However, Officer Amundson had seen the first two numbers of the Taurus's license plate, 8 and 2, and they began canvassing the area, looking for the car. About two to four minutes later, they found the Taurus parked about one and one-half miles away. He stated that the car was "kind of pulled into a back alley slash driveway area" at 1001 Pennock Avenue and that its license tag number was 828 ZRD. Officer Amundson said that it was cold outside and that he felt the hood of the Taurus. The hood was very hot, indicating that the car "had just been recently running either for a long time or at a high rate of speed." He also smelled "burnt brakes from braking a lot [and] stopping." The car was locked, and Officer Amundson saw no signs that it had been stolen.

Officer Amundson testified that he reported the Taurus's tag number to dispatch and learned the tag was registered to Shemeka Goliday at 1500 Porter Road. While Officer Amundson and other officers were standing around the Taurus, Iconia Jean Andrews arrived in a maroon Chrysler. Officer Amundson said that upon seeing the Taurus, Andrews was in shock, was very upset, and said, "[O]h, my God, what has he done[?]" Andrews gave the appellant's name to the officers and told them the Taurus belonged to "Meka." Andrews also told them that she and the appellant had a child together but that the appellant was cheating on her with Meka and driving Meka's car. Andrews claimed the appellant had asked her to come there and pick him up. In the officers' presence, Andrews telephoned the appellant and

tried to get him to "come out." However, he told her "that it was too risky, to just go ahead and leave."

Officer Amundson testified that while he and his partner were still on the scene, his partner received a telephone call from Kimberly Meneese, who lived at 1006 Pennock, about someone trespassing on her property. Meneese claimed that she had seen a man run from a car and jump over her fence and that "she had that recorded on video." The officers went to Meneese's home, and she showed them a still picture on a television screen of a man climbing over her fence. Officer Amundson pulled up a photograph of the appellant on the computer in his patrol car, and the appellant looked like the man climbing the fence. He stated, "It was -- it was pretty obvious to everyone that was in the room that had seen the photograph in the computer and seen the still photograph that this was the individual that had run from us and who we looking for." Officer Amundson asked Meneese if the police "might be able to get a copy of the video for evidence." However, he never returned to her home to get the copy. That night, he obtained a warrant for the appellant's arrest. He arrested the appellant on March 22, 2012, at 1500 Porter Road.

On cross-examination, Officer Amundson testified that he followed the Taurus westbound on Douglas Avenue for two or three blocks, that the Taurus turned left into the alley, and that he followed the Taurus into the alley. Officer Amundson turned off his patrol car's lights and sirens in the alley. He said that the Taurus turned left out of the alley and that he "saw some of the cars having to stop and having to look out for [the Taurus] and everything." He acknowledged that he did not get a clear look at the driver's face but said that the driver was wearing a dark-colored, long-sleeve t-shirt. When the officers found the Taurus at 1001 Pennock, Officer Amundson spoke with the people who lived there, but they did not know anything about the car's owner. The officers did not search the car or try to obtain fingerprints from it. Officer Amundson acknowledged that Maneese lived "across the street from 1001 Pennock and three houses down."

Kimberly Meneese testified that she lived at 1006 Pennock. She said that she had had problems with people trespassing, that she had a fence around her property, and that she had a video surveillance system monitored by seven security cameras. On February 1, 2012, Meneese was standing at her living room window and saw a man walk in front of the window. She described the man as African-American, "nice-looking," and bald. She said that she had never seen him before, that she was "freaked . . . out," and that she telephoned the police immediately. When they arrived, she showed them a "full facial" picture of the man from her security system. She said that she had had the security cameras for about seven months at that time and that she later tried to make a copy of the video but did not know how. After two weeks, the images were recorded over. She identified the appellant in court as the man she saw on February 1, 2012.

On cross-examination, Meneese testified that the appellant was walking, not running. She did not call 911 when she saw him but called an officer who previously had helped her with issues in the neighborhood. It was dark when she saw the appellant, and she only saw him for a couple of seconds. She said that he was wearing a jacket and matching pants and that the lighting in her yard made his clothing look "white or like an acid blue jeanish white or something like that." The police asked her to keep a copy of the surveillance video. However, she thought the appellant got away and did not think the police would ask her for it. Also, she did now know at the time that the video would be recorded over after two weeks. Therefore, she did not have the video for trial.

On redirect examination, Meneese testified that she had "new high-tech bulbs" lighting her back yard. The lights were on all the time.

Shameka Goliday testified that she lived in an apartment at 1500 Porter Road. In February 2012, she owned a 2000 white Ford Taurus. The State asked her where her car was on February 1, 2012, and she answered, "I don't even remember what day it was that I didn't have my car. But the only time I can recall not having my car is when I let the mechanic look at my car." She said that the mechanic had the car "sometime last year at the beginning" and that it needed a new fuel pump. When the mechanic returned the car to her, it was not fixed. She said that the mechanic's first name was "John" but that she could not remember his last name or telephone number. She said she had tried to get his name and number for the State, but she could not get in contact with him "because it's been so long ago."

Goliday testified that she and the appellant were friends and that they never had a sexual relationship. However, she said she had probably told the appellant that she loved him. Goliday acknowledged that during the previous month, she had spoken with the appellant on the telephone and had told him repeatedly that she loved him. She said that she did not recall discussing their prior sexual activity over the phone but that they probably had "phone sex." Nevertheless, she maintained that she and the appellant were just friends.

Goliday testified that she did not remember talking with the appellant about her testifying in this case. She denied that during her telephone conversations with him, he told her to "stick to the script" or that she was to tell people that he and her car were "none of their business." The State played portions of audio-recorded telephone calls between the appellant and Goliday for the jury. Afterward, Goliday denied that she and the appellant were talking about her having to testify in this case and explained that she and the appellant were talking about her upcoming court date in Ashland City for a charge of driving on a suspended license. She said that when the appellant told her to "stick to the script," he was talking about her case.

-4-

On cross-examination, Goliday testified that she wrecked the Taurus sometime prior to February 12, 2012. The car was "smashed on both sides" and missing a headlight, and Goliday never had the car repaired. Goliday had only one ignition key for the Taurus, and she never let anyone, including the appellant, drive it. She said that the police did not contact her in February 2012, that she did not know her car had been involved in an evading arrest case, and that the State did not contact her about this case until April 2013. She said she would not lie for the appellant.

On redirect examination, Goliday acknowledged that the appellant was arrested at her home and that he told her this case involved her car. She also acknowledged that the State left several letters at her home but that she did not respond to them.

Iconia Andrews testified that the appellant was her seven-year-old son's father and that she had known him about thirteen years. On February 1, 2012, the appellant telephoned Andrews and asked her to pick him up in East Nashville. On the way, Andrews recognized a car that belonged to "Meka." She said "Meka" was Shameka Goliday. Andrews thought the appellant was living with Goliday but was not "one hundred percent on that." Andrews said she told the police, "I know this is her car, and I've seen . . . him in the car." She said she had never seen the appellant driving Goliday's car because the appellant did not have a driver's license.

On cross-examination, Andrews testified that "I really don't want to be here." She stated that she suffered from severe anxiety, depression, bipolor disorder, and epilepsy and that she took Xanax before court for her anxiety. Andrews said she did not know anything about Goliday other than Goliday's first name was "Meka." She said the appellant's sister lived in East Nasvhille. Therefore, when the appellant called her on February 1, 2012, she headed to his sister's house. On the way, she saw the Taurus.

Andrews testified that she did not remember telephoning anyone in the police officers' presence. However, the appellant telephoned her. She said that she was under the influence of alcohol, cocaine, Xanax, and hydrocodone at the time and that she and the appellant were not on good terms. Andrews thought the appellant was involved with Goliday, and Andrews was unhappy about the relationship.

On redirect examination, Andrews testified that the appellant did not tell her that he was at his sister's house on February 1, 2012. However, she then testified that the appellant told her to meet him there.

At the conclusion of Andrews's testimony, the State rested its case. The appellant did not present any witnesses, and the jury convicted him as charged of evading arrest while

operating a motor vehicle in which the flight or attempt to elude created a risk of death or injury to innocent bystanders or other third parties, a Class D felony. After a sentencing hearing, the trial court sentenced him to eight years as a Range II, multiple offender.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction. Specifically, he claims that the State failed to prove his identity as the driver of the Taurus because Goliday testified that she never allowed him to drive her car and because her car may have been in the possession of a mechanic on February 1, 2012. In the alternative, he contends that the State failed to establish that his actions created a risk of death or injury to innocent bystanders or other third parties because no person was identified as having been endangered by his conduct and because Officer Amundson's testimony regarding the issue was "vague." The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the

conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-16-603(b)(1) provides, "It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." Ordinarily, evading arrest is a Class E felony. Tenn. Code Ann. § 39-16-603(b)(3). However, if "the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties," the crime is a Class D felony. Tenn. Code Ann. § 39-16-603(b)(3).

Taken in the light most favorable to the State, the evidence shows that on the night of February 1, 2012, Officer Amundson and his partner saw a white Taurus travel through an intersection without coming to a complete stop at the stop sign. Officer Amundson said that the intersection was well-lit and that the driver was a large, bald, African-American male. When Officer Amundson turned on his patrol car's lights and siren to initiate a traffic stop, the driver increased his speed to seventy miles per hour and fled from the officers. He turned into an alley, traveled to the end of the alley, and pulled into traffic without stopping. Officer Amundson testified that the first two digits of the Taurus's license tag were 8 and 2, that the incident occurred during rush hour traffic, and that cars had to stop to avoid being hit by the Taurus as it exited the alley. Due to the danger the driver of the Taurus was creating, the officers decided to stop their pursuit. However, they found the Taurus parked nearby at 1001 Pennock a short time later. Meanwhile, Kimberly Meneese, who lived three houses down and across the street from 1001 Pennock, saw a bald, African-American male she identified as the appellant climb over her fence and walk in front of her living room window. When Iconia Andrews arrived at 1001 Pennock, she told the officers that the appellant had summoned her to East Nashville to pick him up, that the Taurus belonged to Shameka Goliday, and that the appellant and Goliday were in a relationship. A check of the Taurus's license tag number, 828 ZRD, revealed that it was registered to Goliday. Although Goliday testified that she never let the appellant drive the car and that a mechanic may have had the car at the time of the crime, the jury obviously discredited her testimony. It is the province of the jury to assess the evidence and the credibility of the witnesses, and we do not revisit the jury's determinations with respect to these issues on appeal. See, e.g., State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012). The evidence was more than sufficient to show that the appellant was the driver of the Taurus and that his flight from the officers created a risk of death or injury to innocent drivers he encountered as he exited the alley. Therefore, the evidence is sufficient to support the conviction.

## B. Surveillance Video

The appellant contends that the trial court erred by denying his motion to exclude testimony about Kimberly Meneese's surveillance video because the video was potentially exculpatory and was not preserved by the State. The State argues that the trial court properly denied the motion. We agree with the State.

Before trial, the appellant filed a motion to exclude testimony about the surveillance video pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). At a hearing on the motion, the State advised the trial court that Meneese's video captured a front facial view of the appellant, that Officer Amundson would testify at trial that the person he saw in the video matched a photograph of the appellant, and that Menesse would identify the appellant at trial as the man she saw in front of her window. The State also advised the trial court that the video was stored on Meneese's computer hard drive but "rolls over and falls off at the end of thirty days," that no one tried to retrieve the video within thirty days, and that the State discovered Meneese no longer had the video when the State tried to obtain it. The trial court first found that the video had no exculpatory value. It then stated that the video was owned by a private citizen, was not in the care, custody, or control of the State, and was not destroyed by the State. The trial court ruled that the State had no duty to preserve the evidence and that, in any event, it did not act in bad faith. Thus, the court denied the appellant's motion to exclude testimony about the video.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

In Ferguson, our supreme court addressed the issue of when a defendant is entitled to relief in the event the State has lost or destroyed evidence that was alleged to have been exculpatory. 2 S.W.3d at 915-18. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Id. at 917. Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However,

> "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality,

> evidence must both possess an exculpatory value that was
> apparent before the evidence was destroyed, and be of such a
> nature that the defendant would be unable to obtain comparable
> evidence by other reasonably available means."

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89 (1984)).

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;
>
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
>
> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options such as dismissing the charges or providing an appropriate jury instruction. Id. Generally, a trial court's decision to admit or exclude evidence at trial will not be overturned absent an abuse of discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002). An abuse of discretion exists when the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

We agree with the State that the trial court properly denied the appellant's motion to exclude testimony about the surveillance video because the video was privately owned and never in the State's possession or control. See State v. Yevette Somerville, No. W2001-00902-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 122, at *13 (Jackson, Feb. 11, 2002) (stating that the State had no duty to preserve evidence that was never in the State's possession or control). Moreover, even assuming arguendo that the State had a duty to preserve the video, the degree of negligence in the State's failing to do so was simple negligence. After Officer Amundson viewed the video, he asked Meneese if the police might be able to get a copy of it for evidence. Meneese testified that she tried to make a copy but did not know how and that, unbeknownst to her, her computer hard drive taped over the

video after thirty days. Regarding the significance of the destroyed evidence, the video was not particularly significant in light of Officer Amundson's description of the driver and the Taurus, Meneese's identifying the appellant in court as the man she saw walking in front of her window, and the evidence linking the appellant to Goliday, the owner of the Taurus. Finally, the remaining evidence against the appellant was strong. Therefore, all three Ferguson factors support the trial court's denial of the appellant's motion. See Ferguson, 2 S.W.3d at 794 (stating that an appellate court reviews the application of the Ferguson considerations de novo and conducts its own balancing analysis).

## C. Sentencing

The appellant contends that his eight-year sentence is excessive. He acknowledges that the trial court properly applied enhancement factors based on his prior criminal history but argues that his sentence is not the least severe measure necessary to achieve the purposes for which the sentence has been imposed and is greater than that deserved for the offense committed. The State argues that the sentence is not excessive. We agree with the State.

No witnesses testified at the appellant's sentencing hearing. However, the State introduced the appellant's presentence report into evidence. According to the report, the then twenty-seven-year-old appellant was single, affiliated with the Gangster Disciples, and refused to complete a personal questionnaire for the report unless his attorney was present. The report showed that he received his GED, attended some classes at Tennessee State University, and successfully attended substance abuse and behavior modification programs. The report also showed that he worked at I. A. D. T. and Shoney's. According to the report, the appellant had seven prior felony drug convictions involving cocaine,[1] three misdemeanor convictions of evading arrest, two misdemeanor convictions of assault, two misdemeanor convictions of driving on a suspended license, one misdemeanor conviction of resisting a stop, frisk, halt, or arrest, and one misdemeanor conviction of disorderly conduct. The report showed that he was on parole when he committed the offense in this case and that he had committed numerous probation violations.

The trial court noted that the appellant was a Range II, multiple offender and applied enhancement factors (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (8) that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; and (13), that, at the time the felony was committed, the defendant was released on parole." Tenn. Code Ann. § 40-35-114(1), (8), (13)(B). The trial court applied no mitigating factors. The court stated that the appellant

---

[1]The State introduced into evidence certified copies of judgments for four of the convictions.

"has not been able to behave while he's out of custody. Everything we've tried does not seem to work." The court sentenced him to eight years, the maximum in the range, and ordered that he serve the sentence consecutively to a prior sentence as required by Rule 32(c)(3)(A), Tennessee Rules of Criminal Procedure.

In State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012), our supreme court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; Bise, 380 S.W.3d at 698 n.32. "[A] trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). In other words, "the trial court is free to select any sentence within the

applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Turning to the instant case, the trial court found three enhancement factors applicable, and the appellant does not contest the applicability of those factors. All of the factors involved the appellant's prior criminal record. The trial court found that the appellant was unable to abide by the laws of this State. Given his extensive criminal history, at just twenty-seven years old, we agree with the trial court. The court did not abuse its discretion by ordering that he serve eight years in confinement.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE